[No. A058553. First Dist., Div. Five. Mar. 30, 1994.]

In re the Marriage of SHARON and IRVIN REULING.
SHARON L. REULING, Appellant, v.
IRVIN R. REULING, Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to rules 976(b) and 976.1, California Rules of Court, this opinion is certified for publication except for parts II and III, and the cross-appeal.

## COUNSEL

Bernard N. Wolf and John E. Manoogian for Appellant Wife.

Diana Richmond, McGuiness & Northridge and Robert D. McGuiness for Appellant Husband.

## OPINION

**HANING, J.**—Sharon L. Reuling (Wife) appeals a judgment allocating community property following the dissolution of her marriage to Irvin Reuling (Husband). Her principal contention is that the trial court erred in selecting the valuation date for shares of stock and stock options acquired by Husband during the marriage. Husband cross-appeals from the order awarding Wife attorney fees. We affirm.

### FACTS

The parties were married on January 27, 1962. In 1986 Husband, the chief financial officer of ADAC Laboratories, Incorporated (ADAC), purchased 450,000 shares of ADAC stock. During the marriage he also acquired 225,000 ADAC stock options. The shares and options were held in his name alone. The parties separated October 11, 1987, and Wife petitioned for dissolution on September 19, 1988.

In February 1989 during a discussion concerning division of the ADAC shares and stock options, Wife announced that the ADAC stock certificate was missing, and Husband said he would have it replaced. On March 3, 1989, following a hearing on temporary support, the parties stipulated to an order restraining either of them from transferring community assets. On June 5, 1989, in opposition to Wife's motion for attorney fees and costs, Husband submitted a declaration that he had requested one-half the shares be reissued in Wife's name and was awaiting registration by the transfer agency.

On July 31, 1989, Husband moved for an order bifurcating the issue of division of all the community owned stock from the remaining issues and

setting the stock division issue for trial as soon as possible. In support of his motion he declared "[t]here [was] no reason not to divide and award that stock in kind and equally" between the parties as soon as possible. Wife opposed the motion, moving instead for an order that all community held shares and stock options be divided equally between the parties and that the court reserve jurisdiction to determine the community interest in shares or stock options acquired by Husband prior to separation, the date of which was disputed. Both motions were denied based on the court's opinion that lack of cooperation from counsel in framing the bifurcated issues would make bifurcation inappropriate.

In December 1989 the value of ADAC shares averaged $5.67. In February 1990 the Securities and Exchange Commission (SEC) brought a class action against ADAC, alleging trading violations during 1989 by stockholders other than Husband. At that time ADAC shares were valued at approximately $2.87.

Prior to trial, which took place over several days between April and October 1990, Wife filed a notice of intent to seek a valuation of the shares and stock options as of a date between June 2, 1989, and December 4, 1989, rather than the date of trial. The basis for her request was that Husband managed and controlled the stock since their separation, that he had "insider" knowledge of its imminent devaluation, and that his refusal to honor his earlier "agreement" to divide the stock equally demonstrated bad faith and a deliberate intent to devalue her community interest therein.

In denying Wife's request for an alternative evaluation date the court found:

(1) In January 1988 Wife believed she sent the ADAC stock certificate to a storage company along with Husband's clothes. On March 7, 1989, the transfer agent for the shares was notified that the certificate was lost. Given the value of the stock, replacement of the certificate would require a $38,000 bond, so Husband did not request its reissuance.

(2) The parties contacted the ADAC's attorney in the spring of 1989 inquiring if a transfer of shares could be made to Wife. Given Husband's position as an ADAC "insider," sales of shares and options were governed by SEC rules. In November and December 1989 Wife contacted her broker about selling her portion of the ADAC shares. She informed him of the lost certificate and that she did not know if the shares were "freely transferable." In January 1990 her broker discussed the stock options with ADAC and inquired about a "cashless" option, which required ADAC's approval, but

which ADAC refused. Also in January 1990 ADAC's attorney forwarded certain documents to Husband and secured a stipulation from the parties to proceed with a "no-action" letter to the SEC.[1] On March 5, 1990, ADAC's attorney informed Husband that it was unlikely that SEC penalties would attach to the parties' contemplated division of shares and options. On March 6, 1990, ADAC's attorney informed counsel for both parties that he was awaiting further needed clarification from the SEC, but that the SEC had decided *not* to issue a "no-action" letter. The ADAC attorney had no further communication with the parties.

(3) Husband was unaware of any potential drop in the value of ADAC stock until early January 1990. He was not concerned with loss in value because he did not want to sell his shares. According to an expert in SEC matters, Husband would have been imprudent to sell the ADAC stock or exercise his stock options because "of the possible reception of insider information concerning" the actions brought by the SEC in February 1990. The decline in the stock's value was not related to any activity of Husband, who wanted SEC approval of the transfer of stock and was working with his attorneys to obtain it.

In light of the foregoing findings, the court awarded each party one-half the ADAC shares and stock options and ordered them to bear equally the cost of replacing the lost stock certificate.

DISCUSSION

I

■ Wife's principal contention is that the trial court erred in refusing to value the ADAC shares and stock options as of a date prior to trial. She argues that since Husband had sole control over the shares and options, his refusal to transfer them to her at an earlier date breached his duty to act in good faith with respect to the management and control of the community property, as required by Civil Code former section 5125, subdivision (e).[2] She also contends Husband had a duty to disclose "insider" information concerning the value of the shares and stock options.

---

[1] A "no-action" letter is a letter from an attorney for a government agency to the effect that if the facts are as represented in a request for a ruling, the attorney will advise the agency not to take action because the facts do not warrant prosecution.

[2] At the time of trial Civil Code former section 5125, subdivision (e), stated, in pertinent part: "Each spouse shall act in good faith with respect to the other spouse in the management and control of the community property in accordance with the general rules which control the actions of persons having relationships of personal confidence as specified in Section 5103, until such time as the property has been divided by the parties or by a court. . . ." Former section 5103, subdivision (b), provided that a husband and wife, with exceptions not here

■ Former section 4800, subdivision (a), provided that absent a written agreement of the parties or their oral stipulation in open court, the court shall divide the community estate of the parties equally at the time of judgment, or at a later time if it expressly reserves jurisdiction to do so, and that for purposes of making the division it shall value the assets and liabilities as near as practicable to the time of trial. An exception to this rule is allowed if one party shows good cause for valuing any portion of the community assets at a date after separation and prior to trial, in order to accomplish an equal division of the community estate in an equitable manner. The purpose of the exception is to remedy inequities which may result when one spouse dissipates the community estate after separation, or when the effort and action of one spouse alone and after separation greatly increases the value of the estate. (*In re Marriage of Barnert* (1978) 85 Cal.App.3d 413, 423 [149 Cal.Rptr. 616].) The alternative valuation date should not be employed unless it is the only way to accomplish an equitable division of community assets. (See *In re Marriage of Koppelman* (1984) 159 Cal.App.3d 627, 635 [205 Cal.Rptr. 629].)

■ We conclude the trial court did not abuse its discretion in evaluating the ADAC shares and options as of the date of trial. First, there was no written agreement or in-court stipulation by the parties to divide these assets earlier than trial. (former § 4800, subd. (a).) Absent such agreement, Husband was under no obligation to transfer any of them to Wife until the court issued its judgment dividing the community estate. Second, Wife made no motion to divide these assets prior to trial, and in fact not only stipulated to mutual restraining orders against disposition of community assets, but opposed Husband's bifurcation motion which would have accomplished a division of the shares and stock options at an earlier date. Third, it was undisputed and the trial court found that no conduct of Husband caused a reduction in value of the ADAC stock. Consequently, an alternative valuation date would have resulted in an unequal division of community assets, in violation of former section 4800, subdivision (a).

■ We also conclude the disclosure requirements which Wife contends are imposed by state law are preempted by federal securities laws governing insider trading. As an acknowledged ADAC insider, Husband was subject to SEC regulations governing his transactions concerning ADAC shares and

---

pertinent, were subject to the general rules controlling the actions of persons occupying confidential relations with each other.

Unless otherwise indicated, all further statutory references are to the Civil Code. However, effective January 1, 1994, the family law statutes have been removed from the Civil Code and reenacted in the Family Code. For convenience, we cite to the former Civil Code sections, following the same format utilized by both parties in their briefs on appeal.

options.[3] Had Husband disclosed insider information and transferred shares to Wife to enable her to sell them before their downturn in value, she herself could have have been subject to SEC prosecution as a "tippee," i.e., a recipient of nonpublic material information from an insider. ▮ Even persons who are not technically insiders, but trade securities based on information received from insiders, are bound by the rules concerning insider trading because they represent the same threat to the investing public as the insiders themselves. (*Kuehnert* v. *Texstar Corporation* (5th Cir. 1969) 412 F.2d 700, 702.) ▮ As Husband's expert noted, spouses are frequently the recipients of insider information.

Husband was not averse to dividing the securities prior to trial, but he prudently took steps, such as consulting the ADAC attorney and seeking bifurcation of the issue of division of community securities, to ensure that he would not run afoul of SEC regulations, which could have jeopardized both the community assets and the parties personally. "Good faith" neither requires parties to expose themselves to criminal prosecution through the violation of a penal statute, nor to incur the civil liability attendant to violation of the federal securities laws. The class action by the SEC against the ADAC covered all officers who traded stock in 1989. Since Husband traded no ADAC securities in 1989, he escaped SEC prosecution, unlike his fellow ADAC officers, thereby protecting the community assets and Wife personally.

The disclosures which Wife contends Husband was required to make to enable her to trade in the securities are specifically prohibited by federal laws. The state cannot impose obligations on parties which require them to violate federal law, particularly when violation of those laws may subject them not only to civil liability, but to criminal prosecution as well. (See fn. 3, *ante*; *Securities and Exchange Com'n.* v. *Texas Gulf Sulphur Co.* (2d Cir. 1968) 401 F.2d 833; see also, 18 U.S.C. § 2(a) [aiding and abetting an offense against the United States]; 18 U.S.C. § 371 [conspiracy].)

Wife suggests that Husband owed her a duty to disclose "insider" information so *she* could protect *herself*, regardless of *his* action. This argument

---

[3] Section 16(b) of the Securities and Exchange Act of 1934 (15 U.S.C. § 78p(b)) precludes a corporate insider from realizing a profit from the trading of any security issued by such corporation within any period of less than six months after acquiring the security. For purposes of this statute, an insider is a beneficial owner, director, or officer of the issuing corporation. The statute is designed to prevent the unfair use of information obtained by the insider. (*Kern County Land Co.* v. *Occidental Corp.* (1973) 411 U.S. 582, 583-584, 591-592 [36 L.Ed.2d 503, 507-508, 512-513, 93 S.Ct. 1736].)

Illegal insider trading can result in a fine of up to $1 million and/or 10 years in prison. (15 U.S.C. § 78ff.) Husband's SEC litigation expert testified that the SEC has lately targeted the high technology companies of Northern California, such as ADAC, as one of the primary areas to which particular scrutiny should be paid for insider trading.

erroneously assumes she can invoke the authority of a state statute to violate federal law, and flies in the face of the supremacy clause. (U.S. Const., art. VI, cl. 2.) In her reply brief, Wife makes the suggestion that only if she had *traded* the stock in reliance on insider information would she have violated the law. The short answer to this claim is that if it was her intention to hold the stock and not trade it, she would be in the same position as she was at the time of trial when the stock was divided, and therefore has demonstrated no harm. This last minute claim runs contrary to her previously stated position that she was entitled to insider information so she could have sold her stock before it declined in value.

 In her final argument for an alternate valuation date, Wife contends the matter should be remanded for consideration of the effect of posttrial amendments to former section 5125, subdivision (e), and former section 5125.1 on Husband's conduct concerning the ADAC stock. She claims the posttrial statutory amendments imposed a higher standard of care which the Legislature intended to be applied to all proceedings not finally adjudicated by a judgment from which the time to appeal had elapsed.

Effective January 1, 1992, the "good faith" language of former section 5125, subdivision (e) (see fn. 2, *ante*) was replaced with "fiduciary" duty.[4] Former section 5103 was simultaneously amended to add that property transactions between husbands and wives are subject to the general rules "governing fiduciary relationships" which control the actions of persons occupying confidential relations with each other, and that "[t]his confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners . . . ." (former § 5103, subd. (b).) Former section 5125.1, which outlines the remedies for breach of former section 5125, was also amended to provide that a claim may be brought against the spouse whose breach of the fiduciary duty imposed by former section 5125 results in an impairment to the claimant spouse's interest in the community, "including but not limited to, a single transaction or a pattern or series of transactions, which transaction or transactions have caused or will cause a detrimental impact to the claimant spouse's" community interest. (former § 5125.1, subd. (a).) The amendment to former section 5125.1 renders the

---

[4]The posttrial version of former section 5125, subdivision (e), states: "Each spouse shall act with respect to the other spouse in the management and control of the community property in accordance with the general rules governing fiduciary relationships which control the actions of persons having relationships of personal confidence as specified in Section 5103, until such time as the property has been divided by the parties or by a court. This duty includes the obligation to make full disclosure to the other spouse of all material facts and information regarding the existence, characterization, and valuation of all assets in which the community has or may have an interest and debts for which the community is or may be liable, and to provide equal access to all information, records, and books that pertain to the value and character of those assets and debts, upon request."

breaching spouse liable for 50 percent of any undisclosed or transferred asset, plus attorney fees and costs (former § 5125.1, subd. (g)), or if the breach was performed with oppression, fraud or malice, 100 percent of the asset. (Former § 5125.1, subd. (h), Stats. 1991, ch. 1026, § 4.)

In advancing this argument, Wife does not draw a bright line distinction between the two duties. As many writers have observed, "good faith" is an amorphous phrase, having no definite meaning of its own and usually illustrated in the negative by what it is not. (See *Walbrook Ins. Co.* v. *Liberty Mutual Ins. Co.* (1992) 5 Cal.App.4th 1445, 1455 [7 Cal.Rptr.2d 513].) Black's Law Dictionary defines it as "an intangible and abstract quality with no technical meaning or statutory definition . . . encompass[ing], among other things, an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage . . . . Honesty of intention . . . ." (Black's Law Dict. (6th ed. 1990) p. 693.)

A fiduciary relationship has been defined as "any relation existing between parties to a transaction wherein one of the parties is [] duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept the confidence, can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent." (*Herbert* v. *Lankershim* (1937) 9 Cal.2d 409, 483 [71 P.2d 220].)[5]

"[W]hen . . . the Legislature undertakes to amend a statute which has been the subject of judicial construction[] . . . it is presumed that the Legislature was fully cognizant of such construction, and when substantial changes are made in the statutory language it is usually inferred that the lawmakers intended to alter the law in those particulars affected by such changes. [Citations.]" (*Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 659 [147 Cal.Rptr. 359, 580 P.2d 1155].) In *In re Marriage of Stevenot* (1984) 154 Cal.App.3d 1051 [202 Cal.Rptr. 116], this court was asked to define extrinsic fraud for purposes of setting aside a judgment and marital settlement agreement, and

---

[5]The essence of the more familiar fiduciary relationships—attorney/client, principal/agent, trustee/beneficiary—is that "the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." (*Barbara A.* v. *John G.* (1983) 145 Cal.App.3d 369, 383 [193 Cal.Rptr. 422].) Insofar as former section 5125, subdivision (e), as amended, imposes a reciprocal fiduciary duty on both spouses who share management and control of the community assets, the superior/dependent distinction is not as one-sided in the marital setting.

concluded that existing judicial decisions on the subject were distinguishable because they were written before statutory changes concerning community property management. We stated that when the Legislature amended former section 5125, effective January 1, 1975, to give both spouses equal right of management and control of community property, it "imposed a lesser duty of good faith in the management and control of community property[]" than the fiduciary duty imposed on husbands by prior cases when, under former law, they had sole management and control. (154 Cal.App.3d at pp. 1067-1068.) Given a stated judicial distinction between the two standards and the subsequent change in the statutory language from "good faith" to "fiduciary duty," we may reasonably infer that the Legislature intended by the 1991·amendments to replace a lesser standard with one deemed higher.

We do not agree, however, that the Legislature intended the higher standard to be applied to conduct that occurred before the amendments were enacted. ■ A statute is retroactive if it affects rights, obligations, acts, transactions and conditions performed or existing prior to adoption of the statute and substantially changes the legal effect of those past events. (*Kizer* v. *Hanna* (1989) 48 Cal.3d 1, 7 [255 Cal.Rptr. 412, 767 P.2d 679]; *Aetna Cas. & Surety Co.* v. *Ind. Acc. Com.* (1947) 30 Cal.2d 388, 391 [182 P.2d 159].) There is a strong presumption that statutes are to operate prospectively, absent a clear indication to the contrary. (*Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1208-1209 [246 Cal.Rptr. 629, 753 P.2d 585]; *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 587 [128 Cal.Rptr. 427, 546 P.2d 1371]; *Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control* (1966) 65 Cal.2d 349, 371 [55 Cal.Rptr. 23, 420 P.2d 735].) This long-established presumption applies particularly to laws creating new obligations, imposing new duties, or exacting new penalties because of past transactions. (See *Pignaz* v. *Burnett* (1897) 119 Cal. 157, 160 [51 P. 48]; *Wienholz* v. *Kaiser Foundation Hospitals* (1989) 217 Cal.App.3d 1501, 1505 [267 Cal.Rptr. 1].) The rationale behind the presumption was succinctly stated by the preeminent author on the subject: "[R]etroactive laws are characterized by want of notice and lack of knowledge of past conditions and [they] disturb feelings of security in past transactions." (2 Sutherland (5th ed. 1993) Statutory Construction, § 41.04, p. 350.) An additional element of the rationale is the fact "that the purpose of a legislative alteration would not often attain significant advancement by application of the amended legislation to transactions which preceded the legislative change." (*Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control, supra*, at p. 371.)

■ The enactment containing the amendments at issue here lacks a specific statement regarding retroactivity. A statute's silence as to retroactivity is an authoritative indication the Legislature intended a prospective

application. (*Nelson* v. *A.H. Robins Co.* (1983) 149 Cal.App.3d 862, 870 [197 Cal.Rptr. 179].) However, the amendatory enactment's introductory paragraph states that "by this act, the Legislature intends to clarify the management standards controlling Sections 5103 and 5125 . . . ." (Stats. 1991, ch. 1026, § 1.) Generally, an amendment whose purpose is to clarify preexisting law or make express the original legislative intent is not considered a change in the law because it simply states the law as it has always existed and retroactivity is not involved. (*Bowen* v. *Board of Retirement* (1986) 42 Cal.3d 572, 575, fn. 3 [229 Cal.Rptr. 814, 724 P.2d 500].) But in view of *Stevenot*, we conclude the Legislature was doing more than merely reiterating the existing state of the law. A statute that creates new obligations by raising a standard of care and imposing, for the first time, a specific penalty for breach of the new standard, constitutes more than a simple clarification of existing law; it manifests an intent to change it.

Wife relies on *In re Marriage of Bouquet, supra,* 16 Cal.3d 583, giving retroactive effect to an amendment to former section 5118, which established separate property status to the earnings and accumulations of both spouses while living separate and apart from each other. Prior to the amendment only the wife's earnings and accumulations during such periods were separate—the husband's earnings and accumulations retained their community character. The *Bouquet* court concluded that the Legislature intended retroactive application to the statutory amendment. (16 Cal.3d at p. 588.) However, as *Evangelatos* v. *Superior Court, supra,* 44 Cal.3d at pages 1208-1209 held, *Bouquet* is not to be interpreted as modifying the well-established principle of prospective statutory application.

In arguing for retroactive application of these amendments, Wife necessarily concedes, arguendo, that Husband's conduct regarding the ADAC stock complied with the law prior to and at the time of trial. In effect, she is contending that parties can be penalized after the fact for conduct that was lawful by legislative fiat at the time it occurred, because the Legislature subsequently decided that marital partners should govern themselves by a different standard. The response to this contention is best stated in *In re Marriage of Buol* (1985) 39 Cal.3d 751 [218 Cal.Rptr. 31, 705 P.2d 354]: "[T]he manifest interest in finality pervading this sensitive area of the law is thwarted by retroactive application of the statute. 'The net effect of retroactive legislation is that parties to marital dissolution actions cannot intelligently plan a settlement of their affairs nor even conclude their affairs with certainty after a trial based on then-applicable law.' " (*Id.*, at p. 763, quoting, *In re Marriage of Taylor* (1984) 160 Cal.App.3d 471, 479 [206 Cal.Rptr. 557] (dis. opn. of Sims, J.).)

Finally, we observe that these amendments, whatever the intent, have no practical or legal effect on the issue with which we are concerned here. First,

insofar as the duty of disclosure is concerned, and presuming no preemptive contrary duty, the "good faith" obligation requires no less than the "fiduciary duty" obligation in a dissolution action. Second, as the trial court found by substantial evidence, Husband did everything he could to accomplish an early transfer of the ADAC stock and options, in spite of Wife's loss of the stock certificate on at least two occasions, and her refusal to bifurcate the trial for purposes of an earlier distribution. This finding supports the court's judgment under either standard. Third, as we previously stated, the federal securities laws and regulations proscribing the use of insider information preempt any state statute purporting to impose a conflicting obligation of disclosure and use of such information. Finally, we note that if Wife has held on to her stock as she indicated in her reply brief was her intent, it has substantially increased in value since the alternative valuation dates she urges.

## II, III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## CROSS-APPEAL*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

Judgment affirmed. The parties shall bear their own costs.

Peterson, P. J., and King, J., concurred.

A petition for a rehearing was denied April 21, 1994.

---

*See footnote, *ante*, page 1428.